Argued and submitted September 9, 2021, reversed and remanded April 6, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

AMANDA LYN BROWN,
*Defendant-Appellant.*

Washington County Circuit Court
18CR54684; A170300

508 P3d 45

Defendant appeals a judgment of conviction for felony possession of methamphetamine, ORS 475.894(2)(b) (2017), assigning error to the trial court's denial of her motion to suppress evidence obtained during an investigatory stop. She contends that the stop violated Article I, section 9, of the Oregon Constitution because the officer lacked reasonable suspicion that she had committed the crime of unauthorized use of a motor vehicle (UUV) and, therefore, the court erred in denying her motion to suppress evidence discovered during the stop. *Held*: The totality of the circumstances—being a passenger in a suspected stolen car that eluded police, and then walking away from the car without voluntarily making contact with the police—was insufficient to provide objectively reasonable suspicion of the crime of UUV. Consequently, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

Beth L. Roberts, Judge.

John Paul Evans, Deputy Public Defender, argued the cause for appellant. On the brief were Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Erin J. Snyder Severe, Deputy Public Defender, Office of Public Defense Services.

Patricia G. Rincon, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Mooney, Presiding Judge, and Shorr, Judge, and DeVore, Senior Judge.*

_____
  * Shorr, J., *vice* DeHoog, J. pro tempore.

MOONEY, P. J.

Reversed and remanded.

## MOONEY, P. J.

Defendant appeals a judgment of conviction for felony possession of methamphetamine, ORS 475.894(2)(b) (2017), *amended by* Ballot Measure 110 (2020), Or Laws 2021, ch 591, § 39,[1] asserting two assignments of error. We reject the first without discussion. As to defendant's second assignment—that the trial court erred in denying her motion to suppress evidence—we agree and, accordingly, reverse and remand.

We review the denial of a motion to suppress for legal error, deferring to the trial court's findings of historical fact to the extent there is constitutionally sufficient evidence in the record to support them. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). And, we "assume that the trial court decided historical facts necessary to its legal conclusions in a manner consistent with those conclusions." *State v. Reyes-Herrera*, 369 Or 54, 61, 500 P3d 1 (2021). In this case, the pertinent facts are largely undisputed.

Officer Pfaff, an 18-year veteran of the Tualatin Police Department, was on patrol near Bridgeport Village one afternoon when she saw an older black Acura make a sudden lane change, crossing over a solid white line in violation of the traffic laws. Pfaff testified that older Acuras, Hondas, and Toyotas are "easy targets" for theft and she "pretty much make[s] it [her] practice to run every plate on every older vehicle like that—that [she] see[s]." Pfaff ran the license plate of the Acura and learned that it was registered to two females in the Salem area and that the name associated with the registration "seemed like it was a Hispanic name," which did not match the male driver and female passenger in the Acura. She also learned that the car was not reported as stolen.

Pfaff decided to initiate a traffic stop, but the car turned right into Bridgeport Village and quickly parked. As it parked, the passenger—defendant—"looked directly at" Pfaff. Pfaff acted disinterested, circled around, and then came back into the parking lot where she could view the

---

[1] We cite the 2017 version of the statute throughout this opinion, which was the version in effect when defendant allegedly committed the offense.

car. The driver had gotten out of the car at that point and was standing at its rear with the trunk open; he did not see Pfaff. Defendant was still seated in the car. After a short time, the driver got back in the car and drove back onto Bridgeport Road. Pfaff followed and, as she passed the car, noticed that the front license plate was obscured by a license plate cover. Pfaff briefly lost track of the car but spotted it again near the rear entrance to a nearby business complex. She testified that her suspicion

> "was that it was a stolen vehicle at the—for one thing. I definitely felt by the totality of the circumstances that there is criminal activity going on, you know, and it—it may have just been that he was a suspended driver, but something was going on with that vehicle, and I had reason to stop it, and was attempting to do so."

When asked the basis for her suspicion that the car was stolen, she replied:

> "[T]he fact that it was from Salem, this it—everything about it was not—just seemed suspect. The registered owners, two females from Salem. I've got a male driving. The strange erratic driving behavior. The you know, quick park, which in my experience *** has led me to investigations where people were up to criminal activity. His clear desire to avoid."

Pfaff activated her overhead lights. The driver looked at her and she pointed for him to park. He looked down at his lap, then backed up and took off. Pfaff pursued. During the pursuit, the car sped down the center turn lane, almost crashed a couple of times, went through a lighted intersection, and eventually turned into the parking lot of a store. Pfaff lost sight of the car for a short time, but found it again, parked haphazardly in the middle of the lot, with the driver side door open.

Nobody was in the car, and Pfaff saw defendant walking away. Defendant was not making eye contact and, according to Pfaff, she was "obviously trying to avoid me." Pfaff immediately detained defendant in handcuffs "until [she] could figure everything out for safety." Pfaff described being "on high alert" and that her safety concerns arose from the fact that she did not know where the driver was,

whether he was armed, and his frame of mind. The scene was "very fluid, fast moving" and "chaotic." She explained that she detained defendant because she

> "believed that more likely than not at the least that—that was going to come back as a stolen vehicle. So the belief that she had been a passenger in a stolen vehicle. She's leaving the scene, you know, that doesn't really speak to a—a person of innocence if she had been in a vehicle and had not committed any kind of crimes, or had any information regarding those crimes, I would have expected she would stay in the vehicle and—and get police contact. So I didn't know what was going on. I didn't know if she'd been a (indiscernible) person in that vehicle. I had reason to detain her and speak with her about what she was doing and what was going on."[2]

Pfaff checked defendant for weapons, told her that she was not free to leave, separated her from her purse, and detained her in the back of her patrol car for a short time, at one point driving out of the parking lot and then quickly returning. Defendant was cooperative, telling Pfaff the driver's name and potential alias, and that he had left with a McDonald's bag that she believed had a gun in it. Pfaff let defendant out of the patrol car, took off the handcuffs, and returned her purse to her. Defendant pulled up a photograph of the driver from Facebook and gave it Pfaff to distribute to the other units in the area.

Officer Powell then arrived on the scene; at that point, defendant was seated on a short brick wall near Pfaff, and her purse was close to her. Pfaff asked Powell to take a statement from defendant. Powell knew only that a vehicle had attempted to elude during a traffic stop, the driver had fled, and the passenger was detained at the scene. Powell immediately asked defendant if there were any weapons inside her purse or "anything [he] would need to know about." Defendant responded that there were drugs in the purse and, in response to further questioning, that the drugs were methamphetamine. Powell handcuffed defendant and put her in the back of his patrol car while he conducted a records check, which revealed that she was on supervision.

---

[2] Pfaff later clarified that she did not know if defendant was a kidnap victim or if she might need medical care.

After contacting defendant's supervision officer, Powell formally arrested defendant, read her her *Miranda* rights, and searched her purse. The search revealed a capped syringe with a dark substance and a few plastic baggies, which defendant admitted contained methamphetamine.

Defendant was charged with unlawful possession of methamphetamine, ORS 475.894. She moved to suppress the evidence obtained during the stop, contending that the warrantless seizure and search violated Article I, section 9, of the Oregon Constitution.[3] The trial court denied the motion, concluding that, "based on the totality of the circumstances, Officer Pfaff had reasonable suspicion to investigate this defendant for the crime of Unauthorized Use of a Motor Vehicle [UUV], and she was properly detained." The court also found that Officer Powell "clearly articulated his officer safety concerns, and those are reasonable given the totality of the circumstances, and his lack of personal knowledge regarding the defendant's interaction with Officer Pfaff." And, the court found that defendant "admitted to the drugs[, a] detainer was issued[,] and the search was made incident to arrest."

A bench trial was held, and the court found defendant guilty. She appeals the ensuing judgment of conviction.

Defendant maintains on appeal that the trial court erred in denying her motion to suppress, contending, among other arguments, that Pfaff lacked reasonable suspicion to detain her and, even if the stop was lawful, there was no objectively reasonable officer-safety justification for the degree or duration of her detention. She further contends that Powell's question about the contents of her purse was not based on a reasonable, circumstance-specific concern for officer safety. As explained below, we agree with defendant's first argument—that the trial court erred in concluding that the stop was supported by reasonable suspicion of UUV, thus it violated Article I, section 9—and we reverse and remand on that basis. We therefore need not address defendant's alternative arguments.

---

[3] Article I, section 9, provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

As noted, Article I, section 9, protects against warrantless searches and seizures. There is no dispute that this case involves a "stop" of defendant—that is, the type of seizure "that is a temporary detention for investigatory purposes."[4] *Maciel-Figueroa*, 361 Or at 169-70. The question is whether the stop was lawful under Article I, section 9, which we assess under the principles outlined in *Maciel-Figueroa*:

> "For police officers to make a stop, they must reasonably suspect—based on specific and articulable facts—that the person committed a specific crime or type of crime or was about to commit a specific crime or type of crime. For a court to determine that an investigative stop was lawful under Article I, section 9, the court (1) must find that the officers actually suspected that the stopped person had committed a specific crime or type of crime, or was about to commit a specific crime or type of crime, and (2) must conclude, based on the record, that the officers' subjective belief—their suspicion—was objectively reasonable under the totality of the circumstances existing at the time of the stop."

*Id.* at 182. The officer's suspicion "must be particularized to the individual based on the individual's own conduct." *State v. Kreis*, 365 Or 659, 665, 451 P3d 954 (2019). It "requires less than probable cause but more than mere speculation." *Id.*

Here, the trial court concluded that Pfaff had reasonable suspicion to stop defendant for the crime of UUV, ORS 164.135 (2017), *amended by* Or Laws 2019, ch 530, § 1.[5] Implicit in the court's conclusion is a finding that Pfaff subjectively believed that defendant had committed or was about to commit UUV. *See Reyes-Herrera*, 369 Or at 61 (explaining that we "assume that the trial court decided historical facts necessary to its legal conclusions in a manner consistent with those conclusions"). Defendant contends, first, that

---

[4] There is not, for example, any contention that Pfaff detained defendant as a potential material witness to a crime. *See State v. Fair*, 353 Or 588, 609, 302 P3d 417 (2013) (articulating the constitutional requirements for a "stop and temporary on-the-scene detention of a likely material witness").

[5] ORS 164.135 (2017) provided, as relevant:

"(1) A person commits the crime of unauthorized use of a vehicle when:

"(a) The person takes, operates, exercises control over, rides in or otherwise uses another's vehicle, boat or aircraft without consent of the owner[.]"

the record does not support the court's implicit finding as to Pfaff's subjective belief and, second, that even if it does, that belief was not objectively reasonable.

Defendant's first contention presents a close question on this record.[6] However, it is a question we need not resolve because, even assuming that Pfaff subjectively believed that defendant had committed the crime of UUV, we conclude, as a matter of law, that such a belief was not objectively reasonable under the circumstances. *See State v. Bradford*, 290 Or App 889, 894, 417 P3d 530 (2018) ("Our review of a stop is 'based on the record made concerning the officer's actual belief that the defendant may have committed a crime,' as well as 'the specific facts, articulated by the officer, that led him or her to believe that the defendant may have committed a crime, which we then review as a matter of law for objective reasonableness.'" (Quoting *Maciel-Figueroa*, 361 Or at 183.)).

To satisfy the standard for reasonable suspicion supporting an investigatory stop, the officer must "point to specific and articulable facts that give rise to a reasonable inference that the defendant committed or was about to commit a specific crime or type of crime." *Maciel-Figueroa*, 361 Or at 165. In other words, the state is not required to prove "that the articulated facts give rise to a conclusion with certainty that a crime has occurred or is about to occur; instead, based on the specific facts known and articulated by the officer, a reviewing court must conclude that the officer's subjective belief *could* be true, as a matter of logic." *Id.* at 184 (emphasis in original). Notably, "[a]lthough officers reasonably may draw inferences about human behavior from their training and experience, an officer's hunch based

---

[6] Although Pfaff testified that she believed that defendant "had been a passenger in a stolen vehicle" and a "person of innocence" would not have been leaving the scene—which might support the court's implicit finding as to her subjective belief—Pfaff also testified that she "didn't know what was going on" and indicated that she did not know whether defendant was a suspect, a victim, or a witness—which cuts against that finding. *See State v. Bradford*, 290 Or App 889, 893-94, 417 P3d 530 (2018) ("Mere suspicion that the person is engaged in some kind of general criminal activity at the time of the stop is insufficient because, '[w]hen an officer's suspicion reduces to that level of generality, such a rule would permit an officer to stop an individual whenever the officer believes that the person appears to be a criminal or that something about a situation seems "criminal."'" (Quoting *Maciel-Figueroa*, 361 Or at 181 (brackets in *Bradford*).)).

on training and experience is, by itself, insufficient to form a basis for reasonable suspicion." *Kreis*, 365 Or at 667 (internal quotation marks and citations omitted).

The state's argument that it was objectively reasonable for Pfaff to believe that defendant had committed UUV is layered: The state argues that it was objectively reasonable for Pfaff to believe that the Acura was stolen, based on the make and age of the car, the driver's elusive behavior, and the fact that the driver did not match the gender or location of the car's registered owners.[7] It follows from there, the state contends, that it was objectively reasonable for Pfaff to believe that *defendant* knew she was riding in a stolen vehicle—*see State v. Rayburn*, 246 Or App 486, 489-90, 266 P3d 156 (2011), *rev den*, 351 Or 675 (2012) ("To convict a person under ORS 164.135(1) for riding in a stolen vehicle, the state must prove that the person knew that the vehicle was stolen at the time he or she was a passenger.")—based on the facts that defendant "had been a passenger in the suspected stolen vehicle, including at the time that the driver eluded Pfaff and almost crashed into other cars," and she later walked away from the scene, not making eye contact with Pfaff, and clearly trying to avoid her, when Pfaff would have expected her to stay and contact police.

Even the state's first premise is shaky. Pfaff's observation that certain models of vehicles are easy targets for theft is of little weight, especially given the fact that Pfaff knew that the car had *not* been reported stolen. Similarly, the fact that the car was registered to females in the Salem area also provides little to support a suspicion that the car was stolen. There *was* a female in the car, and it would not be unexpected for a person from Salem to be in the Bridgeport Village area, a distance of less than 40 miles. Those circumstances, at best, amount to no more than a "hunch" that the car was stolen. That leaves only the driver's behavior in eluding the officer, which, to be sure, provides some support for Pfaff's suspicion that the Acura was a stolen vehicle. But,

---

[7] The state points to the fact that the registered "names" did not match the driver. To the extent the state is suggesting that reasonable suspicion might be based on a mismatch between what seemed to the officer to be a Hispanic name and the appearance of the vehicle's driver and defendant, we reject that suggestion categorically.

as Pfaff herself articulated, that behavior could also indicate that the driver had a suspended license or, indeed, a myriad of other reasons for fleeing the police.

However, even assuming that Pfaff had objectively reasonable suspicion that the Acura was stolen, that suspicion is premised entirely on the *driver's* conduct—yet individualized suspicion as to *defendant* is required to satisfy Article I, section 9. *See State v. Kingsmith*, 256 Or App 762, 772, 302 P3d 471 (2013) ("[M]ere proximity to suspected criminal activity, or association with a suspected (or known) criminal, is insufficient to support reasonable suspicion."). In other words, Pfaff's suspicion that the car was stolen, even if objectively reasonable, does not alone give rise to a reasonable inference that defendant knew that it was stolen—that is, that defendant knew that she was riding in a car without the owner's permission. *See State v. McCall*, 315 Or App 538, 542, 501 P3d 1086 (2021) ("For UUV, the officers must have had an objective basis to believe that defendant exercised control over or otherwise used the vehicle knowing that the vehicle was stolen."); *State v. Gibson*, 268 Or App 428, 430, 342 P3d 168 (2015) (under ORS 164.135, the person using the vehicle "must know that he or she does not have the owner's consent" to do so).

And, the only other circumstance Pfaff articulated to support her suspicion that defendant had committed UUV was that defendant started to walk away from the scene after the driver fled, avoiding contact with Pfaff, when Pfaff would have expected a "person of innocence" to stay and contact police. We have frequently observed, however, that a person's nervous or potentially furtive acts add little to the reasonable suspicion calculus. *See, e.g.*, *State v. Dawson*, 282 Or App 335, 342, 386 P3d 165 (2016) (so stating and listing examples). In *Dawson*, we concluded that the facts of (1) the defendant's nervous behavior, (2) his vague and "potentially evasive" response that he had borrowed the vehicle from a friend, and (3) the lack of connection between the defendant and the registered owner, were insufficient to support reasonable suspicion of UUV to justify extension of a traffic stop. *Id.* at 342-43. As to the evasive nature of the defendant's response, we explained:

> "As we have held, a 'defendant's evasive reaction to questioning that he [was] constitutionally entitled to refuse to answer,' even in combination with past criminal activity, does not provide reasonable suspicion of current criminal activity. *See State v. Frias*, 229 Or App 60, 65-66, 210 P3d 914 (2009) (concluding that the defendant's evasive response about why he had been visiting a friend, combined with officer's knowledge that the defendant had history of drug use, did not create reasonable suspicion of current drug use)."

*Dawson*, 282 Or App at 343 (brackets in *Dawson*). Here, there are even fewer specific, articulable facts to support reasonable suspicion than there were in *Dawson*.

The state contends that our decision in *Rayburn* leads to the conclusion that Pfaff's belief that defendant committed UUV was objectively reasonable. However, in that case, the totality of the circumstances included reliable information that the car in which the defendant was a passenger was stolen—the car's license plate number matched the number of a stolen car—a fact that is conspicuously absent in this case. 246 Or App at 491. Moreover, the officers knew that the vehicle was being driven recklessly shortly before the encounter and its occupants were throwing objects out of it, the defendant was riding in the car when they encountered him, and the driver was unable to remove the key from the ignition. *Id.* at 490-91. Together, those circumstances led us to conclude that probable cause existed that the "defendant and his friends had been joyriding in a car that they all knew was stolen." *Id.* at 493.

Although reasonable suspicion presents a lower bar than the probable cause standard at issue in *Rayburn*, it nonetheless requires more than speculation, which is all that ties defendant to the crime of UUV in this case. *See Kreis*, 365 Or at 665 (reasonable suspicion "requires less than probable cause but more than mere speculation"). We are unprepared to say that merely being a passenger in a car that an officer suspects to be stolen and walking away from the car without volunteering to talk with the police is sufficient to establish reasonable suspicion of UUV. It follows that the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.